# Richmond

## Commonwealth of Virginia v. County Board of Arlington County, Et Al.

January 14, 1977.

Record No. 761421.

Present, All the Justices.

*Andrew P. Miller, Attorney General; Frederick T. Gray (Anthony F. Troy; Chief Deputy Attorney General; D. Patrick Lacy, Jr., Deputy Attorney General; Walter E. Rogers; R. D. McIlwaine, III,* on briefs), for plaintiff in error.

*Henry St. J. FitzGerald; Jerry K. Emrich, County Attorney (John C. Dempsey; George H. Cohen; Julia Penny Clark; Robert E. Paul; Tolbert, Smith, FitzGerald & Ramsey; Zwerdling & Maurer; Bredhoff, Cushman, Gottesman & Cohen,* on briefs), for defendants in error.

*Amicus Curiae:* Public Service Research Council (*Gladys L. Fishel; Dr. Edwin Vieira, Jr.* [Md.], on brief), for plaintiff in error.

CARRICO, J., delivered the opinion of the court.

The question for decision in this case is whether, absent express statutory authority, a local governing body or school board can recognize a labor organization as the exclusive representative of a group of public employees and can negotiate and enter into binding contracts with the organization concerning the terms and conditions of employment of the employees.

The challenge to the authority of the local boards arose when the Commonwealth filed in the court below separate motions for declaratory judgment against the County Board and the County School Board of Arlington County. Alleging that the two boards, in excess of their powers, had adopted certain policies and had entered into several collective bargaining agreements with various labor unions as the exclusive representatives of different groups of Arlington public employees, the Commonwealth sought to have the policies and agreements declared void and unenforceable.

The two boards filed responsive pleadings. In addition, the County Board filed a cross-motion for declaratory judgment, praying for a declaration that it possessed the power to formulate the policy and to enter into the agreements. The School Board demurred to the Commonwealth's motion on the ground that, as a matter of law, it had authority to adopt its policy and to enter into the agreements with the labor organizations.

The trial court permitted the various labor organizations involved to intervene as parties defendant and consolidated the two actions for trial. Upon agreement of all parties that "no genuine issue of fact" was in dispute, the matter was submitted to the court as a "pure question of law." In a written opinion and final order, the court granted summary judgment in favor of the County Board on its cross-motion for declaratory judgment and also sustained the demurrer of the School Board, thus holding that the policies and agreements of the two boards were valid and enforceable. We granted the Commonwealth a writ of error.

### A.

### The Policies.

The policies adopted by the boards are lengthy and detailed. Similar in most respects, they provide, in brief, both for official recognition of labor organizations as the exclusive representatives of the employees of various units of county government and for the negotiation and execution of binding agreements with the recognized organization concerning wages, hours, fringe benefits, and other conditions of employment. Both policies contain provisions prohibiting strikes by employees.

Under the policies, a labor organization may gain recognition as the exclusive representative of an employee unit when at least 30% of the employees evince a desire to be represented by the organization. An election then is held, and if the organization receives a majority of the votes of all employees of the unit eligible to participate in the election, or a majority of the valid ballots cast in an election in which at least 60% of the eligible employees participate, the organization is certified as the exclusive representative or official negotiating agent of all the employees in the unit.

The policies further provide that, once a labor organization is certified as the representative of an employee unit, the appropriate board will negotiate with the organization in an effort to reach agreement concerning wages and other conditions of employment of the members of the unit. If accord is reached, the parties execute a binding written contract embodying the terms of the agreement. If unable to reach agreement, the parties must submit the disputed matters to mediation to induce the disputants to reach agreement through interpretation,

suggestion, and advice. Failing resolution of the disputes by mediation, the parties then submit to advisory factfinding by a panel whose membership includes the labor organization's appointee.

The policies contemplate that any agreement resulting from negotiation shall include procedures for the handling of grievances. Other details of the policies will be discussed *infra*.

## B.

### The Agreements.

On July 1, 1973, the County Board entered into a written agreement with Local 2407, American Federation of State, County and Municipal Employees, AFL-CIO, as exclusive representative of all permanent full-time county employees, excepting firefighters and other classifications. Then, on June 6, 1975, the Board entered into a written agreement with the Arlington County Firefighters Association as exclusive representative of all permanent full-time employees of the fire department, excepting supervisory personnel and other classifications. Although originally for a three-year term, each contract is self-renewable for subsequent yearly periods.

On October 11, 1973, effective July 1, 1973, for a three-year period, the School Board entered into a written agreement with Local 2240, American Federation of State, County and Municipal Employees, AFL-CIO, as the sole and exclusive bargaining agent for all full-time and regular part-time non-professional school employees. Later, on May 7, 1975, effective July 1, 1975, for a two-year period, the School Board entered into a written agreement with the Arlington Education Association, representing all instructional personnel in the school system. Then, on June 5, 1975, effective July 1, 1975, for a two-year period, the School Board entered into a written agreement with the Arlington Association of School Administrators and Supervisors, Local 27, School Administrators and Supervisors Organizing Committee, AFL-CIO, as the exclusive collective bargaining representative for all supervisory personnel in the school system.

The agreements executed by the County Board and the School Board deal extensively with matters of payroll deduction of union dues, seniority, filling of vacancies, layoffs, wages, hours,

holidays, leave, retirement, and insurance. All establish elaborate procedures for handling grievances and provide for direct participation by the labor organizations in the grievance process. All the agreements require arbitration of any grievance unsettled by the specified procedures, with the labor organizations taking part in the selection of arbiters. Other details of the agreements will be discussed *infra.*

## C.
### The Trial Court's Decision.

In its written opinion, the trial court stated that it is well settled in Virginia that the powers of a board of supervisors are fixed by statute and are limited to those powers conferred expressly or by necessary implication. The court stated further, however, that another rule also applies, *viz.*, a general grant of power implies the necessary means for carrying into execution the power granted, and, accordingly, when a public body expressly is given power to do a certain act, but no specific mode or manner of exercising the power is prescribed, the public body, in its discretion, may choose any reasonable method to exercise the power.

The court noted that, by statute, a board of supervisors is granted power to manage the affairs of the county,[1] to do all things "advisable" to establish and administer a police department,[2] to employ firefighting and other personnel,[3] and to do all things "incidental" or "convenient" to build, maintain, and operate various public works projects.[4]

With respect to a school board, the court noted that the board operates under a constitutional mandate to supervise the schools in its division.[5] The court further noted that, by statute, a school board is empowered to "contract, or be contracted with," [6] to make local regulations for the conduct of schools,[7] to conduct

---

[1] Code § 15.1-689.
[2] Code § 15.1-156 and the various legislative acts cited therein.
[3] Code §§ 27-13, 15.1-278, 15.1-677, and 15.1-682.
[4] Code §§ 15.1-175(h) and (i).
[5] Article VIII, Section 7, Constitution of Virginia.
[6] Code § 22-63.
[7] Code § 22-72(2).

schools according to law,[8] and to employ teachers on recommendation of the division superintendent.[9]

From this recitation of granted powers, the court concluded that the policies adopted and the agreements entered into by the County Board and the School Board "are impliedly authorized and should be upheld unless they are clearly contra to the public policy of this Commonwealth." Finding that the public policy of Virginia does not prohibit the actions taken by the two boards, the court declared the policies and agreements valid and enforceable.

## D.

### The Commonwealth's Contentions on Appeal.

The Attorney General, on behalf of the Commonwealth, contends:

In determining the extent of the powers of the County Board and the School Board, a rule of strict construction applies. Pursuant to that rule, the boards operate under limited grants of power, and may exercise only those powers conferred expressly or by necessary implication.

No Virginia statute expressly authorizes public bodies to adopt the sort of policies and to enter into the type of agreements involved in this case. It would be unrealistic to conclude that such agreements are necessary to carry out local governmental functions and, therefore, it would be improper to imply the power to enter into the agreements.

The Commonwealth's contentions continue:

The contracts involved in this case are collective bargaining agreements — binding pacts between the boards and employee organizations recognized as the exclusive representatives of all employees in given units. In these agreements, the public employers have bound themselves to a stated course of action with respect to wages and other conditions of employment and have contracted away the right to change that course of action in the public interest, irrespective of changing conditions, without the consent of the employee organization. No Virginia law, express or implied, authorizes a local public body to confer upon

---

[8] Code § 22-72(4).

[9] Code § 22-72(5).

a union, by binding contract, the legal right to insist that the public body may not engage in any course of action contrary to the terms of the contract without the consent of the union.

Continuing the Commonwealth's contentions:

To imply the power of local public bodies to enter into collective bargaining agreements would be contrary to legislative intent and violative of the public policy of Virginia. Such intent and policy are expressed in legislative action beginning with adoption on February 8, 1946, upon the recommendation of the then governor, of Senate Joint Resolution No. 12,[10] which reads, in pertinent part, as follows:

> "It is contrary to the public policy of Virginia for any State, county, or municipal officer or agent to be vested with or possess any authority to recognize any labor union as a representative of any public officers or employees, or to negotiate with any such union or its agents with respect to any matter relating to them or their employment or service."

This legislative declaration has continued to state the public policy of the Commonwealth through the intervening years. The inflexibility of the policy has been proclaimed in subsequent opinions of the Attorney General.[11] Not until 1972 was any effort made to alter the policy. In that year and at each successive session of the General Assembly, bills were introduced which would have altered Virginia's policy with respect to public employee collective bargaining. At its 1972 session, the General Assembly created the Commission to Study the Rights of Public Employees [12] to consider and report on the desirability of enacting legislation to authorize collective bargaining in the public sector. The reports of the Commission have been considered at the 1973, 1974, and 1975 sessions of the General Assembly. Yet, although some of the reports were favorable to the concept of public employee collective bargaining, none of the many bills introduced over the years to approve the concept has ever passed.

At its 1973 session, the General Assembly did enact statutes

---

[10] Acts 1946, at 1006.

[11] Reports of the Attorney General (1962-63), at 117; (1969-70), at 158.

[12] Acts 1972, at 1645.

which require the governor, for state employees,[13] and local governing bodies, for local employees,[14] to establish grievance procedures. Each statute, however, states that the term grievance "shall not be interpreted to mean negotiations of wages, salaries or fringe benefits."

Most recently, at the 1976 session of the General Assembly, House Joint Resolution No. 108 was offered. This resolution would have declared that Senate Joint Resolution No. 12 of 1946 no longer reflects the public policy of the Commonwealth. House Joint Resolution No. 108 was not adopted but was carried over by the House Committee on Labor and Commerce [15] for consideration at the 1977 session of the General Assembly.

Concluding the Commonwealth's contentions:

Both the legislative history concerning Senate Joint Resolution No. 12 and the consistent action of the General Assembly in rejecting all legislation approving the concept of public employee collective bargaining clearly demonstrate that legislative intent and the public policy of Virginia are against the concept. Whether collective bargaining in the public sector should be authorized is a singularly political question for the General Assembly, and not the courts, to decide. The trial court erred, therefore, in taking upon itself the determination to change existing public policy and in upholding the policies adopted and the agreements entered into by the County Board and the School Board in this case.

E.

The Boards' Contentions on Appeal.

The County Board and the School Board contend:

The trial court correctly held that the boards are entitled not only to exercise all powers conferred expressly or by necessary implication but also, in their reasonable discretion, to select the method of exercising a granted power when no mode or manner is specified for its execution. And the court properly recognized the special role occupied by the School Board as an independent

---

[13] Code § 2.1-114.

[14] Code § 15.1-7.1.

[15] House Journal (1976), at 1778.

local agency, emanating from its constitutional mandate to supervise the schools in its division.

In addition to the generalized constitutional mandate to the School Board, both boards, by statute, have been granted the authority to manage the affairs of the governmental units entrusted to their direction and also have been empowered expressly to enter into contracts, to hire employees, and to fix the terms and conditions of their employment. And the School Board has been authorized specifically to "make local regulations for the conduct of the schools." [16] From these granted powers, the further authority may be implied for the boards to adopt the policies and to enter into the agreements involved in this case. Furthermore, because the express grants specify no mode or manner for their exercise, the boards, in adopting the policies and entering into the agreements, merely selected what, in their discretion, were reasonable methods of executing the powers granted.

The boards' contentions continue:

Contrary to the Commonwealth's assertion, the policies involved in this case do not contemplate, and the agreements entered into do not constitute, collective bargaining agreements. What is involved is merely a "process," as characterized by the trial court, "by which the [boards] confer with employee representatives in an effort to reach an accord regarding wages, hours and working conditions."

The contracts are not collective bargaining agreements because they recognize the ultimate authority of the boards to make all final decisions, preserve the right of individual employees to be heard, and prohibit strike activity. In executing the agreements, therefore, the boards did only what the General Assembly intended when, in 1973, it adopted House Joint Resolution No. 208,[17] which states:

"[I]t is the sense of the General Assembly of Virginia that the public policy require[s] every public employer to promulgate and implement such rules or policies as will provide to its employees an opportunity to contribute to the

---

[16] Code § 22-72(2).

[17] House Journal (1973), at 120, 816, 892.

development of policies which directly or indirectly affect the working conditions of the employees."

Continuing the boards' contentions:

The agreements also are consistent with and follow guidelines established in several opinions of the Attorney General concerning public employee labor relations. These opinions were rendered July 30, 1962, February 16, 1970, February 18, 1970, October 7, 1974, November 19, 1974, and April 8, 1975. Specifically, in the opinion of February 18, 1970,[18] the Attorney General stated that a school board could recognize and enter into an agreement with a local association of teachers concerning matters of economic interest, provided (1) the association embraced more than 50% of the certificated teaching personnel, (2) the board retained the ultimate right of decision, (3) the agreement preserved the rights of others to be heard, and (4) the agreement provided for only nonbinding mediation or arbitration. Then, in the opinion of November 19, 1974,[19] the Attorney General stated that what he had ruled in his 1970 opinion "regarding the rights of school boards applies also to boards of supervisors."

The boards contend further:

Public policy does not prohibit the policies and agreements involved in this case. Senate Joint Resolution No. 12, which was adopted in 1946 and which declared public employee collective bargaining to be contrary to public policy, does not have the force and effect of law. Indeed, in 1962, the Attorney General ruled [20] that Joint Resolution No. 12 did not prohibit public officials from negotiating with labor unions.

Furthermore, both the adoption in 1973 of House Joint Resolution No. 208,[21] recognizing the right of public employees to contribute to the development of employment policies which affect them, and the opinions of the Attorney General establishing guidelines for public employer-employee agreements, furnish clear evidence that what may have been the

---

[18] Report of the Attorney General (1969-70), at 231.

[19] Report of the Attorney General (1974-75), at 22.

[20] Report of the Attorney General (1962-63), at 117.

[21] House Journal (1973), at 816, 892.

public policy in 1946 is not the policy today. In fact, the General Assembly specifically has recognized the concept of public employee collective bargaining. In a 1972 amendment [22] to the Washington Metropolitan Area Transit Authority Compact, the General Assembly provided that the Authority should not only deal with employees through representatives of authorized labor organizations but also should submit disputes to binding arbitration. Also, in a 1974 enactment,[23] the General Assembly provided that transportation commissions assuming operation of private transit facilities should continue to recognize the rights of employees under existing collective bargaining agreements.

The failure of the General Assembly to enact the various bills which would have given general approval to the concept of public employee collective bargaining does not demonstrate public policy or legislative intent. What is important is that the General Assembly, with full knowledge of the Attorney General's opinions establishing guidelines for public employer-employee agreements and of the proliferation of such agreements in recent years, has not acted to prohibit collective bargaining in the public sector.

Concluding the boards' contentions:

The policies and agreements in this case, therefore, are neither contrary to public policy nor inconsistent with legislative intent. And because the boards had both the clearly implied power to act as they did and the right of reasonable discretion in selecting the manner of exercising their expressly granted powers, the trial court correctly held that the policies and agreements were valid and enforceable.

This brings us to consideration of the issues involved in this appeal.

I.

The Nature of the Agreements.

■ Initially, it is necessary to determine whether the boards' policies permit, and the agreements constitute, collective bargaining agreements. On this point, in its opinion, the trial court stated:

[22] Acts 1972, ch. 571.
[23] Acts 1974, ch. 53 (Code § 15.1-1357.2).

"If 'collective bargaining' merely connotes the process by which the [boards] confer with employee representatives in an effort to reach an accord regarding wages, hours and working conditions, then it is not inappropriate. However, if the term contemplates or includes the right to strike upon inability to agree; procedures for penalizing a party who refuses to bargain in good faith or who engages in other unfair labor practices, then it would be completely inapposite as applied to the agreements in these cases."

The court then stated that the boards' policies and agreements (1) prohibit strike activity, (2) preserve the right of individual employees to be heard, and (3) recognize the ultimate authority of the boards to make all final decisions. Apparently, the court was of opinion that, because of these three factors, the contracts entered into by the boards do not constitute collective bargaining agreements, at least not "in the sense normally employed in the private employment sector."

The boards stress these three factors in supporting the trial court's characterization of the arrangement involved in this case as a mere "meet and confer" process rather than collective bargaining. We turn, therefore, to consideration of the three factors.

(1.) *Strike Activity.*

The policies do enunciate prohibitions against strike activity. Similarly, the two County Board agreements and the School Board contract with non-professional employees contain anti-strike provisions; however, the other two School Board agreements are silent on the subject. But aside from what the policies and agreements do or do not provide, we note that Code § 40.1-55 prescribes that the employment of any public employee who engages in strike activity shall be terminated automatically. So the anti-strike factor of the policies and agreements is of neutral effect in determining their true nature.

(2.) *Right to be Heard.*

Both policies do purport to preserve the right of an individual employee to represent himself or to select his own representative with respect to matters involving wages, hours, and other conditions of employment. It is clear from the policies, however, that once a labor organization is recognized as the official representative of the employees of a particular unit, the

appropriate board will negotiate concerning wages, hours, and other conditions of employment exclusively with that organization as the representative of all employees of the unit, and an individual employee is foreclosed from participation in the negotiations. It is equally clear that any agreement resulting from the negotiations bindingly determines the rights of all employees of the unit, current and prospective, during the life of the contract, whether all the employees are members of the labor organization or whether all are agreeable to the negotiated accord.

Furthermore, with respect to the right of an individual employee to represent himself or to choose his own representative in grievance proceedings, the County Board policy provides that "no representative of an employee organization other than the recognized employee organization may represent an employee in the presentation of grievances." While the School Board policy states that it recognizes the right of an individual employee to represent himself or to select his own representative in grievance proceedings, the non-professional employee contract provides that, in the steps preliminary to arbitration, a grievance may be presented only "with" or "through" a union representative, and the instructional personnel agreement permits, in the preliminary process, a grievance to be presented by the union alone. All the agreements involved in the case place in the hands of the labor organization the exclusive right to decide whether to submit an employee's grievance to arbitration, and all the contracts provide that one of the arbiters shall be selected by the labor organization.

(3.) *Ultimate Right of Decision.*

The County Board policy states that nothing therein shall be construed to circumscribe, modify, or abridge inherent management functions of the county. In both county board agreements, however, the county's "absolute right to determine the mission of the government and to administer the County" is retained only insofar as the right is not "expressly modified or restricted by the express terms" of the particular agreement.

The School Board policy does recognize that the Board "is by law the policy-making and governing body for the public schools within the County, with a statutory responsibility for educational policy and effective, efficient school management."

The policy provides further, however, that "the Board will continue to exercise unilaterally its final managerial authority" only "[i]n the absence of explicit, limiting commitments made in an agreement negotiated with" a recognized employee organization.

In the School Board agreement with non-professional employees, the Board's "exclusive right and responsibility" to exercise its management functions is retained "except as expressly modified or restricted by a specific provision" of the agreement. The School Board's supervisory employee agreement states that the Board has agreed "to adopt as its policy the specific commitments made in [the] contract." And in the instructional personnel contract, the School Board agrees not only to amend its rules and regulations to the extent necessary to give effect to the provisions of the agreement but also to refrain from amending its rules and regulations "so as to change the provisions" of the accord without first notifying the labor organization and "negotiating a written agreement to any such proposed changes."

Further, all the agreements involved in this case are multi-year contracts and all contain reopener clauses. However, while both County Board agreements provide for renegotiation of questions of wages, retirement, and insurance benefits, only the labor organization is permitted to reopen these questions. The School Board agreement with non-professional employees may be reopened only if "any authority superior to the . . . School Board . . . causes any reduction in the established levels of spending on Arlington Public Schools," and the School Board agreements with instructional personnel and supervisory employees may be reopened only with the mutual consent of the parties.

Finally, both board policies provide for, and all the agreements establish, procedures for arbitration of grievances. The County Board-Firefighters contract and all three school board agreements, however, prescribe binding arbitration of grievances.

Given the foregoing analysis, does it follow that the contracts involved in this case constitute collective bargaining agreements? We have not previously defined the term "collective bargaining agreement" or the process by which such an accord is reached. Helpfully, however, the School Board has supplied a

"commonly agreed" definition of the term "collective bargaining," which we quote:

> " *'Collective bargaining.'* The process by which an employer bargains with his employees *collectively* regarding wages, hours and working conditions, instead of *individually* at the time each individual employee is hired. This is done through the selection by the employees of an employee representative . . . . Such an employee representative, having been selected by a majority of the employees in an appropriate unit, then speaks with the employer regarding wages, hours and working conditions in that unit and the two sides bargain with a view to reaching an agreement on those matters for that unit . . . ."

With the help of this definition, and considering the content and substance of the policies and agreements involved in this case, we have no difficulty in concluding that the boards' policies do permit, and the contracts do constitute, collective bargaining agreements. Admittedly, there are differences between the two policies and variations among the several agreements. And it is doubtless true that the collective bargaining involved here does not bear all the characteristics attributable to that term in the industrial sector. But there can be no question that the two boards involved in this case, by their policies and agreements, not only have seriously restricted the rights of individual employees to be heard but also have granted to labor unions a substantial voice in the boards' ultimate right of decision in important matters affecting both the public employer-employee relationship and the public duties imposed by law upon the boards.

The question now becomes whether the boards had the power to adopt the policies and enter into the agreements.

## II.

### The Boards' Powers.

■ Upon the question of the extent of the boards' powers, the parties are in complete disagreement. The Attorney General contends on behalf of the Commonwealth that the question is to be determined by application of the Dillon Rule of strict construction, *viz.*, that local public bodies may exercise only those powers conferred expressly or by necessary implication.

On the other hand, the boards contend that the extent of their powers is to be determined not only by application of the Dillon Rule, but also by resort to another rule, *viz.*, that a general grant of power implies the necessary means for carrying into execution the power granted, and, accordingly, where a power is granted expressly but no mode or manner is specified for its execution, the public body, in its discretion, may select any reasonable method of exercising the power.

The question whether local governing bodies in Virginia, absent express statutory authority, have the power to bargain collectively with labor organizations is one of first impression for this court. The only Virginia judicial authority we have found on the subject is *Teamsters Local Union No. 822* v. *City of Portsmouth,* Civil No. 75-184-N, August 11, 1975 (90 LRRM 2145), *aff'd,* 534 F.2d 328 (4th Cir. 1976), decided by the United States District Court for the Eastern District of Virginia, where Judge Kellam stated:

> "The legislature of Virginia has the right to and has determined not to recognize union representation of public employees . . . . In the absence of legislation a local government has no authority to recognize a labor organization as representative of city employees. It is not a matter of constitutional right, but legislative." 90 LRRM at 2147.

Both sides to this controversy have favored us with numerous citations from other jurisdictions supporting their respective views concerning the power of local public bodies to bargain collectively with labor organizations representing public employees. We have read with interest all the authorities cited, and have found them helpful. In the end, however, we must decide ourselves what is the law of Virginia; so no fruitful purpose would be served by repeating the citations here. It suffices to say that the views of both sides are supported by respectable authority.

There can be no question that Virginia long has followed, and still adheres to, the Dillon Rule of strict construction concerning the powers of local governing bodies. As recently as June, 1975, in *Board of Supervisors of Fairfax County* v. *Horne,* 216 Va. 113, 117, 215 S.E.2d 453, 455-56, we said:

> "In Virginia the powers of boards of supervisors are fixed by statute and are limited to those conferred expressly or by

necessary implication. *Gordon* v. *Fairfax County*, 207 Va. 827, 832, 153 S.E.2d 270, 274 (1967); *Johnson* v. *Goochland County*, 206 Va. 235, 237, 142 S.E.2d 501, 502 (1965). This rule is a corollary to Dillon's Rule that municipal corporations have only those powers expressly granted, those necessarily or fairly implied therefrom, and those that are essential and indispensable. *City of Richmond* v. *County Board*, 199 Va. 679, 684-85, 101 S.E.2d 641, 644-45 (1958).

"The Commission on Constitutional Revision recommended inclusion of a provision to reverse Dillon's Rule as to cities and certain counties in order to relax the constraints on local government. Report of the Commission on Constitutional Revision (1969), at 228-231. This recommendation, however, was rejected by the General Assembly, and was not incorporated in the revised Constitution which became effective July 1, 1971. We must conclude, therefore, that, regardless of its fate in other jurisdictions, Dillon's Rule remains in effect in this state . . . ."

And, with respect to local school boards, in *Kellam* v. *School Board of the City of Norfolk*, 202 Va. 252, 254, 117 S.E.2d 96, 98 (1960), we said:

"School boards . . . constitute public quasi corporations that exercise limited powers and functions of a public nature granted to them expressly or by necessary implication, and none other . . . ."

We have, however, recognized the "reasonable selection of method" rule, relied upon by the boards, which permits local public bodies to exercise discretionary authority where a grant of power is silent upon its mode or manner of execution. *See Kirkham* v. *Russell*, 76 Va. 956, 961 (1882). At first blush, the "reasonable selection of method" rule would appear to be at odds with the Dillon Rule of strict construction or, at least, as the boards in the present case suggest, to permit a greater exercise of power than the Dillon Rule. But we do not believe either is the proper view of the two rules.

In the authorities we have consulted, the "reasonable selection of method" rule always is stated in terms that there must be an express grant of power silent upon its mode or manner of execution before the rule comes into play. We perceive no reason, however, that the rule should not apply also, in a proper case,

to a power which has been implied from an express grant. Given this application, the "reasonable selection of method" rule can be made to harmonize with, rather than contradict, the Dillon Rule.

Thus, the Dillon Rule is applicable to determine in the first instance, from express words or by implication, whether a power exists at all. If the power cannot be found, the inquiry is at an end. On the other hand, where a power is found to exist but the question is whether it has been exercised properly, then the "reasonable selection of method" rule may be applicable, and, as we will demonstrate later, the inquiry is directed to whether there may be implied the authority to execute the power in the particular manner chosen.

We now note and consider the School Board's special contention that it has constitutional authority to select the mode or manner of carrying out its functions, independent of legislative grant or interference. The Board claims this authority under the mandate of "supervision" expressed in Article VIII, Section 7 of the Virginia Constitution. This contention, however, is answered not only by *Kellam* v. *School Board of the City of Norfolk, supra,* but also by our decision in *DeFebio* v. *County School Board of Fairfax County,* 199 Va. 511, 100 S.E.2d 760 (1957), *appeal dismissed,* 357 U.S. 218 (1958). *DeFebio* involved the validity of an act of the General Assembly placing in the hands of a state pupil placement board the authority to assign pupils to particular schools. In upholding the statute, we said:

"The legislature functions under no grant of power. It is the supreme law making body of the Commonwealth, and has the inherent power to enact any law not in conflict with, or prohibited by, the State or Federal Constitutions. Section 133 of the Virginia Constitution [now Article VIII, Section 7], while vesting 'supervision' of public schools in local school boards, does not define the powers and duties involved in that supervision. The general power to supervise does not necessarily include the right to designate the individuals over whom supervision is to be exercised. If the legislature deems it advisable to vest the power of enrollment or placement of pupils in an authority other than the local school boards, it may do so without depriving such local school boards of any express or implied constitutional power of supervision." 199 Va. at 512-13, 100 S.E.2d at 762.

This rationale applies here. The general power of school boards to supervise does not necessarily include the right to deal with the labor relations of employees in any manner the boards might choose, unfettered by legislative restriction. Indeed, to say that the constitutional power to supervise includes authority to bargain collectively with labor organizations is to say, at the same time, that the General Assembly could not prohibit school boards from so bargaining; this would be not only unrealistic but also a subversion of the powers of the General Assembly.

Inapposite are several Virginia cases relied upon by the School Board to support its claim of constitutional autonomy. Typical are *Howard* v. *County School Board of Alleghany County*, 203 Va. 55, 122 S.E.2d 891 (1961), which involved a state statute requiring sale of school property if the disposition was favored by a majority of voters in a public referendum, and *Harrison* v. *Day*, 200 Va. 439, 106 S.E.2d 636 (1959), which involved state statutes divesting local school boards of their power and control over public schools, upon the occurrence of a particular event, and placing the control in the hands of the governor.

In these cases, the statutes involved were invalidated because they were found to have the effect of removing from local school boards and transferring to others functions indispensable to the boards' constitutional duty to supervise public schools. Here, no legitimate claim can be made that the power to enter into collective bargaining agreements is indispensable to the discharge of the functions of the School Board. Neither does this case involve the involuntary transfer to others of any function of the School Board. So the cases relied upon by the School Board do not aid its cause.

We hold, therefore, that whether the School Board had the power to act as it did in this case is to be determined by the same rules applicable to the County Board. And whether the powers of both boards are determined by the Dillon Rule of strict construction or the "reasonable selection of method" rule, the result, in the view we take of the case, is the same.

It is agreed that no statute expressly confers upon the boards the power to bargain collectively with labor organizations. We are concerned, therefore, with a question of implied power, and this is the question even when we consider the "reasonable selection of method" rule. Indeed, this rule is premised upon the proposition that, because a grant of power is

general in its terms, the necessary means for carrying into execution the power granted must be *implied* before the authority may be exercised. The real difference between the Dillon Rule and the "reasonable selection of method" rule is that, under the former, any doubt is resolved against the existence of the power while, under the latter, the doubt is resolved in favor of the method selected to exercise the power.

Specifically, we are concerned in this case with the question whether, from the power conferred upon the boards in general language to enter into contracts and to hire employees and fix the terms and conditions of their employment, there may be implied the further power to bargain collectively with labor organizations. In questions of implied power, the answer is to be found in legislative intent. To imply a particular power from a power expressly granted, it must be found that the legislature intended that the grant of the express also would confer the implied.

In determining legislative intent, the rule is clear that where a power is conferred and the mode of its execution is specified, no other method may be selected; any other means would be contrary to legislative intent and, therefore, unreasonable. *See Page* v. *Belvin*, 88 Va. 985, 990, 14 S.E. 843, 845 (1892). A necessary corollary is that where a grant of power is silent upon its mode of execution, a method of exercise clearly contrary to legislative intent, or inappropriate to the ends sought to be accomplished by the grant, also would be unreasonable. *See Groner* v. *City of Portsmouth*, 77 Va. 488, 490 (1883); *Kirkham* v. *Russell, supra*, 76 Va. at 966-67.

Consistent with the necessity to uphold legislative intent, the doctrine of implied powers should never be applied to create a power that does not exist or to expand an existing power beyond rational limits. Always, the test in application of the doctrine is reasonableness, in which concern for what is necessary to promote the public interest is a key element. *See National Linen Service* v. *City of Norfolk*, 196 Va. 277, 281, 83 S.E.2d 401, 404 (1954).

In determining the issue at hand, we emphasize the history in the General Assembly of Virginia, previously recited, of the concept of public employee collective bargaining. Aside from the question of public policy, which we do not reach, we believe this history is important because it not only furnishes a clear and

unambiguous indication of legislative intent but it also magnifies the situation in which this court finds itself, where it is asked to imply a power the General Assembly consistently has refused to confer expressly.

For this court to imply the power here sought, we would be required to find that because local governmental boards possess the power to enter into contracts and to hire employees and fix the terms and conditions of their employment, the boards also possess the authority to bargain collectively with labor organizations. But if the power cannot be found in this source, the boards in the present case then would have us find that, nonetheless, they possess the power to bargain collectively because they have discretionary authority to select any reasonable method of exercising a power expressly granted but silent upon its mode or manner of execution.

We cannot make either finding. To imply the contended for authority would constitute the creation of a power that does not exist or, at least, the expansion of an existing power beyond rational limits. To sanction the method of exercising authority which the boards have selected in this case, even giving the selection the benefit of any doubt, would result in an unreasonable and strained application of the doctrine of implied powers. To approve the actions taken in this case would ignore the lack of any support for the proposition that collective bargaining by the boards is necessary to promote the public interest. And, finally but not least important, to imply the power asserted by the boards would be contrary to legislative intent.

The powers vested in local boards to enter into contracts and to hire employees and fix the terms and conditions of their employment are of ancient origin, conferred at a time when the concept of collective bargaining in the public sector had not emerged as a debatable issue. While this fact is not controlling, because changing conditions may warrant different considerations of the extent of power, the recent Virginia history of public employee collective bargaining is persuasive, if not conclusive, that the General Assembly, the source of legislative intent, has never conferred upon local boards, by implication or otherwise, the power to bargain collectively and that express statutory authority, so far withheld, is necessary to confer the

power. And when legislative intent is plain, our duty is to respect it and give it effect.

Before concluding the question, however, we must consider two matters stressed by the boards in their assertion that already they possess legislatively conferred authority to bargain collectively with labor organizations. First, the boards say that the various opinions of the Attorney General, previously mentioned herein, support the proposition that the general powers conferred by the legislature upon local governmental bodies authorize the boards to bargain collectively. An examination of those opinions, however, discloses that our view of this case is not inconsistent with, but is supported by, the expressions of the Attorney General. While, in some of the opinions, the Attorney General has approved certain proposed practices in the public employer-employee area, consistently he has indicated disapproval of the notion that local governmental bodies are authorized to bargain collectively with labor organizations.

Each of the opinions we will refer to is relied upon by the boards. Yet, in his opinion of July 30, 1962,[24] the then Attorney General stated that it was "the policy of the State to be against negotiating with any labor union or its agents with respect to any matter relating to [public employees] or their employment or service." In his opinion of February 16, 1970,[25] the present Attorney General stated that if a unit of government undertook to negotiate a collective bargaining contract "it would be necessary to imply the power to so do in the absence of legislative authorization," and that "the better practice would be to enact legislation authorizing such negotiations, together with any desirable limitations thereon."

In his opinion of February 18, 1970,[26] the Attorney General stated that a "collective bargaining agreement entered into by a school board would be of doubtful enforceability," and that the authority of political subdivisions to enter into collective· bargaining agreements "should be founded on a specific grant of authority rather than implied from the existing powers of

---

[24] Report of the Attorney General (1962-63), at 117, 119.

[25] Report of the Attorney General (1969-70), at 158, 159.

[26] Report of the Attorney General (1969-70), at 231, 232.

political subdivisions." In his opinion of October 7, 1974,[27] the Attorney General stated that the authority of counties, cities, and towns "to collectively bargain cannot be implied from general powers granted localities" but "must be specifically granted to the localities by the General Assembly."

Finally, in his opinion of April 8, 1975,[28] the Attorney General reviewed a proposed agreement between the School Board of the City of Hampton and the Hampton Education Association. The Attorney General stated:

"To the extent that the proposed agreement may be intended or construed to confer exclusive recognition on the association . . . it would be unlawful since the General Assembly has not authorized school boards to grant exclusive recognition to any group or association."

Of further interest is an article of the proposed Hampton agreement which would have provided that "all terms and conditions of employment presently in existence shall remain in existence throughout the term of the proposed agreement unless they are changed by future agreement." Concerning this proposed provision, the Attorney General stated that it "would have the effect of binding the School Board to past decisions in perpetuity," and that since the provision "destroys the right of the School Board to alter present policies, it cannot withstand constitutional scrutiny." [29]

█ Second, the boards say that the two legislative enactments,[30] previously noted, relating to collective bargaining rights of employees of transportation districts, support the proposition that the boards presently possess the power to bargain collectively. We disagree. Approval of the concept of collective bargaining in this narrow and select public field is not an indication of legislative intent to embrace the concept generally. Indeed, the contemporaneous disapproval of the various proposals to confer general collective bargaining

---

[27] Report of the Attorney General (1974-75), at 77.

[28] Report of the Attorney General (1974-75), at 78, 79.

[29] Article VIII, Section 7, relied upon by the School Board in the present case to sustain its power to bargain collectively, was cited by the Attorney General as the basis of his "constitutional scrutiny" objection.

[30] Acts 1972, ch. 571; Acts 1974, ch. 53 (Code § 15.1-1357.2).

authority is another indication that legislative intent is to the contrary.

We are faced in this case with overwhelming indications of legislative intent concerning the concept of collective bargaining in the public sector. For this court to declare that the boards have the power to bargain collectively, when even the wisdom of incorporating the concept into the general law of the Commonwealth is the subject of controversial public and political debate, would constitute judicial legislation, with all the adverse connotations that term generates. Conscious of the respective roles of the General Assembly and the judiciary, we decline to intrude upon what the Attorney General succinctly describes as a "singularly political question."

### III.

### Unlawful Delegation of Power.

The trial court, having concluded that the boards possessed the power to enter into the agreements involved in this case, found it necessary to determine further whether the boards' actions had resulted in an unlawful delegation of power. The court decided there had not been any "unlawful delegation of legislative authority."

Because we conclude herein that the boards did not possess the power to enter into the agreements, we do not reach the question of unlawful delegation. Accordingly, we express no opinion upon the subject.

### IV.

### The Judgment of this Court.

For the reasons assigned, we hold that to the extent the boards' policies permit collective bargaining and collective bargaining agreements with recognized labor organizations, the policies are declared invalid. Because the contracts entered into are the products of such collective bargaining, the agreements are declared void. This results in reversal of the judgment of the trial court and entry of final judgment here in favor of the Commonwealth.

*Reversed and final judgment.*