COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Chief Judge Decker, Judges Fulton and Ortiz
Argued at Richmond, Virginia


CITY OF RICHMOND

OPINION BY
v.        Record No. 1702-22-2              JUDGE DANIEL E. ORTIZ
APRIL 2, 2024

PROPERTY VENTURES, INC.


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
W. Reilly Marchant, Judge

Gregory A. Lukanuski, Deputy City Attorney (Zachary P. Grubaugh,
Assistant City Attorney; Office of the City Attorney, on briefs), for
appellant.

(Bryan K. Streeter; The Law Office of Bryan K. Streeter, PLLC, on
brief), for appellee.  Appellee submitting on brief.


Over several years, the City of Richmond noted the failure of property-owner Property

Ventures, Inc. to properly trim weeds and overgrowth on a parcel of its land within the City.

From time to time, the City posted notices of violation and intervened to trim the grass and other

vegetation on the property, assessing fees and penalties as permitted by Richmond City Code

§ 11-105.  When the assessments went unpaid, the City moved for judicial sale of the parcel to

enforce its lien for delinquent taxes under Code § 58.1-3965.  The circuit court dismissed the

action, finding that the City had exceeded its authority by requiring the property owner to

maintain City-owned land bordering its parcel and that the City failed to prove the underlying

ordinance violations.  Though we hold that the City had power under the Richmond City Charter

and Code § 15.2-1115 to enforce its weeds ordinance on both public and private land, we affirm

the circuit court's judgment because its finding that the City did not adequately prove the

violations is not plainly wrong.

BACKGROUND

In March 2021, the City of Richmond asked the circuit court to order judicial sale of the property at 4001 Sharon Court, to collect $5,176.85 in unpaid taxes, penalties, interest, costs, and fees. The property is owned by Property Ventures, Inc. ("PV"); Robert Beloff is PV's sole owner. PV consistently paid real estate taxes on the property but failed to pay special assessments and civil penalties charged for grass cutting and other yard maintenance on the property. Between 2015 and 2021, the City charged PV $1,960 in vegetation and fallen tree abatement charges. The City also assessed $550 in civil penalties for failure to maintain the property, in violation of the City's ordinance. Together with various delinquent bill fees, penalties, interest, and attorney fees, PV owed $7,299.56 as of April 1, 2022.

The circuit court heard evidence in two hearings. On September 17, 2021, John Leybold, Collections Revenue Manager for the City, testified that PV owed real estate taxes amounting to $6,206.52. On cross-examination, Leybold stated that PV consistently paid the amount owed for base real estate taxes yet did not pay assessments for yard maintenance or civil penalties. Leybold noted the City's practice of applying payments received to the oldest tax bills first, such that PV's payments were often applied to pay off older special assessments rather than more recent base tax bills. Thus, PV's account showed a zero-dollar balance for prior years and overdue base taxes in more recent years, complicating the task of delineating what types of payments remained unpaid. PV's total liability also included interest on the special assessments, penalties for late payments, and administrative fees. After Leybold's testimony, the circuit court stated that it would not allow the special assessments because the City had presented insufficient evidence of what they were for. The court continued the case with instructions to the City to bring more concrete records of what taxes were paid, what taxes were owed, and what interest was owed.

The court reconvened on April 1, 2022. The City presented a list of all the abatement charges and penalties it had assessed against PV. Leybold testified again, stating that PV's tax bill had increased to $7,299.56. PV contended that the real issue was whether the City could require PV to maintain the property next to its own, asserting that PV did not own a steep slope on the east side of the yard, leading down to Roanoke Street. The City argued that it had evidence of violations in the main yard and that it could legally compel PV to maintain the slope even if the City owned it.

Michelle Coward, Operations Manager for the City's Property and Control Enforcement Division, testified about repeated enforcement activity at the property over six years. The City introduced the following evidence:

- seven letters, from 2015, 2017, 2018, 2019, 2020, and 2021, describing violations for overgrown weeds on the property and in the "right of way," litter, and fallen trees or branches;
- four photos, some undated, showing violation notices posted near the house's front door;
- a picture of the main yard dated August 20, 2015, showing a shaggy lawn with no height markers;
- pictures dated September 13, 2015, showing a shaggy lawn in both the main yard and on the slope, without height markers;
- a picture of a yardstick placed next to tall weeds to the right of the staircase leading to the front door, dated May 17, 2018;
- a picture of the main yard and slope showing long grass and large bushes, dated May 30, 2018, without a height marker;
- a photo dated May 10, 2019, showing a yardstick placed to the right of the staircase, close to the slope, with weeds reaching taller than the yardstick;
- a photo dated May 10, 2019, showing weeds and vegetation on both sides of the staircase;
- two photos showing shaggy dead grass and brush on both the main yard and slope, dated March 8, 2021, with no height markers;
- four invoices for weeds and trash removal, grass cutting, and tree removal, dated September 11, 2015; July 16, 2018; July 23, 2019; and April 22, 2021, totaling $1,410;
- four bills issued from the City to PV from 2015, 2018, 2019, and 2021, for abatement charges totaling $1,410 and administrative fees totaling $550; and
- five bills from 2017, 2020, and 2021, imposing civil penalties totaling $550.

When asked by the City whether the violations were "only on the one side by the side road," meaning in the contested slope area, Coward said "no." She explained that whether the

slope was owned by the City or was part of PV's property, the City's contractors would trim vegetation on the whole property and bill the City based on the square footage of the property, regardless of the specific location of the violations. At the end of her testimony, the court said, based on the photographs, "the way [the property]'s been maintained in terms of vegetation is horrendous. . . . That's unacceptable. So let's just take that right up front."

The City submitted real estate tax bills for the property from 2013 to 2022 and called Leybold to the stand again. The bills list special assessments matching those put forward by the City for weeds and vegetation charges. Leybold also catalogued payments received from PV. Combining the documents together, Leybold explained that even though PV consistently paid the base real estate taxes, its failure to pay the assessments produced a consistent deficit in the account, which was compounded by penalties and interest. Leybold noted that PV paid its real estate taxes late for the second half of 2018 and all of 2019, incurring penalties and interest unrelated to the weeds violations.

Beloff then testified. He presented a 1990 survey of the property that did not clearly delineate the boundary of his property relative to Roanoke Street. He stated that a metal fence had been on the property "since the beginning of dawn" and demarked the edge of the historical right-of-way. When asked if he worked to maintain the property, Beloff affirmed, "I do. However obviously, there have been times that, obviously, it's possible that it needed yard work. Some of these pictures. I don't know when. I understand now, now it's a little bit backed up."

Beloff testified that he first received a notice of violation for the yard in 2001. After efforts to resolve the issue, Beloff received an email from Johnnie Butler stating that the City would care for the slope. The letter stated that Butler, Division Administrator for Right of Way Management, spoke with O.K. Priddy of the Code Enforcement Division and agreed that this was "more complicated that [sic] just the typical failure of a homeowner to meet the property

- 4 -

maintenance responsibilities." Butler concluded that he would "request" that the recreation department include the slope in their regular maintenance along Roanoke Street. Beloff stated that he next received a violation notice in 2008; he then contacted Priddy about Butler's email and never received a reply. In 2015, he noticed an assessment on his tax bill and called the City for clarification but received no explanation of what the assessment was for.

At the end of the hearing, the court ordered a survey to understand the ownership of the property and asked for authority on whether the City could charge for abatement on the slope if it belonged to the City. The resulting survey showed the edge of PV's property line about 11 feet from Roanoke Street. The City conceded that "of the ground cut by the City, 25.74 percent is outside the property boundaries owned by Mr. Beloff."

Following briefing and a final hearing, the circuit court entered a final order dismissing the motion to sell. The court found that while Code § 15.2-901(A)(3) authorizes the City to abate weeds on an owner's property, the City ordinance exceeded its authorization insofar as it allowed costs for abating weeds on City property. The court concluded that Richmond City Code § 11-105(c) did not require PV to maintain the slope because it was not a "grassy strip." It also found that the City put forward insufficient evidence of a violation under Richmond City Code § 11-105(c) in terms of the height of the weeds and whether they fit into an exception for permitted vegetation. The court finally stated that "it would be unjust" to allow the sale here because of the City's 2001 email to PV, promising that Butler would request that the City maintain the slope for PV. The City appeals.

ANALYSIS

I. Standard of Review

On appeal, we consider de novo all questions of law, including statutory interpretation. *Sarafin v. Commonwealth*, 288 Va. 320, 325 (2014). We similarly review the meaning of

ordinances de novo. *Miller & Rhoads Bldg., L.L.C. v. City of Richmond*, 292 Va. 537, 541 (2016). In contrast, we defer to the factual findings of the trial court "unless it appears from the evidence that [the circuit court's] judgment is plainly wrong or without evidence to support it." *City of Hopewell v. Cnty. of Prince George*, 239 Va. 287, 296 (1990) (quoting Code § 8.01-680).

## II. Dillon's Rule

The crux of this dispute is whether the City has authority to (1) compel a property owner to cut weeds and grass on adjacent property owned by the City; (2) abate weeds and grass on that City property when the property owner fails to do so; (3) charge the owner the cost of such abatement; and (4) collect civil penalties for the failure to comply. We evaluate whether the City acted within the scope of its lawful authority under Dillon's Rule. *City of Va. Beach v. Hay*, 258 Va. 217, 221 (1999). "Under Dillon's Rule, municipal governments have only those powers which are expressly granted by the state legislature, those powers fairly or necessarily implied from expressly granted powers, and those powers which are essential and indispensable." *Id.*

We start with the Richmond City Code. Richmond City Code § 11-105(a) makes it "unlawful for any person who owns or occupies property within the City to permit any grass, plant, bushes, weeds or any other vegetation 12 inches high or over, other than trees, shrubbery, agricultural plants, garden vegetables, flowers or ornamental plants, to exist on such property." Similarly, property owners may not allow any vegetation to reach 12 inches "on any sidewalk, public right-of-way, or grass strip adjacent to such property or unimproved street or alley," unless it fits into a listed exception for trees, shrubs, and the like. Richmond City Code § 11-105(c). If an owner fails, after notice, to remove the offending plants from either location, the City may trim the vegetation and charge abatement costs plus a $150 administrative fee. Richmond City Code § 11-108(a)-(b). Those abatement fees "shall constitute a lien on real property of the owner" and may be collected like other real estate taxes. Richmond City Code

§ 11-108(f). Violators may also face civil penalties. Richmond City Code § 11-105(e). We must determine from what source, if any, the City derives these powers.

A. Va. Code § 15.2-901(A)(3)

The City first points to Code § 15.2-901(A)(3) as the source of its authority. Code § 15.2-901(A)(3) states that "[a]ny locality may, by ordinance, provide that . . . [t]he owners of occupied or vacant developed or undeveloped property therein, . . . shall cut the grass, weeds, and other foreign growth . . . on such property or any part thereof at such time or times as the governing body shall prescribe." A locality may also, "whenever the governing body deems it necessary, after reasonable notice . . . , have such grass, weeds, or other foreign growth cut by its agents or employees." *Id.* In such cases, "the cost and expenses thereof shall be chargeable to and paid by the owner of such property and may be collected by the locality as taxes are collected." *Id.* Abatement charges "which remain[] unpaid shall constitute a lien against such property ranking on a parity with liens for unpaid local real estate taxes and enforceable in the same manner," including by judicial sale under Code § 58.1-3965. Code § 15.2-901(B). Additionally, localities may assess civil penalties for weeds violations. Code § 15.2-901(C).

Code § 15.2-901(A)(3) expressly grants localities power to require "[t]he owners of occupied or vacant developed or undeveloped property therein" to cut back weeds "on such property or any part thereof." "Such," means "[t]hat or those; having just been mentioned." *Such, Black's Law Dictionary* (11th ed. 2019). "Such property" thus refers to the *property owners'* "occupied or vacant developed or undeveloped property" within Richmond City limits.

The City asserts that the inclusion of "or any part thereof" in the statute means that the General Assembly meant to convey a broad intent, stretching beyond the borders of the property. But this defies the plain meaning of the words, which make clear that "or any part thereof" means the City may require property owners to trim weeds on only certain parts of their

- 7 -

property—in only their front yards, for example. *See Cuccinelli v. Rector & Visitors of Univ. of Va.*, 283 Va. 420, 425 (2012) ("When the language of a statute is unambiguous, we are bound by the plain meaning of that language." (quoting *Kozmina v. Commonwealth*, 281 Va. 347, 349 (2011))). Similarly, in authorizing the City to cut weeds and charge abatement fees, the statute refers to "such grass, weeds, or other foreign growth," meaning the same grass and weeds that the City was allowed to require property owners to trim. Code § 15.2-901(A)(3). Code § 15.2-901(A)(3) does not expressly grant the City power to require property owners to trim beyond the bounds of their own property. This power is not fairly implied, as it is not necessary to enable the City to exercise its power to ensure property owners maintain their own properties. *Cf. Hay*, 258 Va. at 221 (power to hire employees was "fairly and necessarily implied" from city charter provisions establishing a legal department and directing the city council to provide for employees); *Commonwealth v. Cnty. Bd.*, 217 Va. 558, 576-77, 581 (1977) (grant of power to school boards to enter contracts, hire employees, and set employment terms did not imply power to enter collective bargaining agreements). The power to compel landowners to maintain City property is also not "essential and indispensable." *Id.* at 574. We therefore conclude that though Code § 15.2-901(A)(3) grants the City power to charge property owners for abatement of weeds, to collect unpaid charges as taxes, to force judicial sale of property for unpaid charges, and to assess civil penalties, these powers are limited only to charges for weeds on a property owner's property, not beyond it.

### B. Richmond City Charter and Va. Code § 15.2-1115

The City also points to the Richmond City Charter and Code § 15.2-1115 as sources of authority for compelling weeding on adjacent property. The Richmond City Charter states that "the city shall have power: . . . [t]o compel the removal of weeds from private and public property . . . and to compel the abatement or removal of any and all other nuisances whatsoever."

Richmond City Charter § 2.04(m).  Code § 15.2-1115 contains similar language.  Code § 15.2-1115(A) ("A municipal corporation may compel the abatement or removal of all nuisances, including but not limited to the removal of weeds from private and public property.").  Unlike Code § 15.2-901(A)(3), these provisions provide for the removal of "weeds" and "nuisances" from both "private *and public* property."  Richmond City Charter § 2.04(m) (emphasis added); *see also* Code § 15.2-1115(A).  Thus, the City expressly has the power to require a property owner to remove weeds from public property.[1]

The City Charter also states that "[i]f after . . . reasonable notice . . . the owner or owners . . . shall fail to abate or obviate the condition or nuisance, the [C]ity may do so and charge and collect the cost thereof from the owner or owners . . . in any manner provided by law for the collection of taxes."  Richmond City Charter § 2.04(m); *see also* Code § 15.2-1115(A).  "Every charge . . . in excess of $200 which has been assessed against the owner of any such property and which remains unpaid shall constitute a lien against such property" with the "same priority as liens for other unpaid local real estate taxes" and may be enforced by judicial sale.  Code § 15.2-1115(B).  Taken together, the Code and the City Charter authorize the City (1) to abate nuisances, including by removing weeds, on both private property and adjacent public property, if after reasonable notice the relevant property owner has failed to do so; (2) to charge property owners for the cost of abatement; and (3) to enforce those charges exceeding $200 as a lien against the property, including by judicial sale.  *See also* Richmond City Code §§ 11-105(a), (b), (e); -108 (implementing this power).  These provisions do not, however, grant the power to levy civil penalties.  That power is not necessary to enforce the City's power to abate the nuisance, given its ability to charge and collect abatement fees.  *See Hay*, 258 Va. at 221.  Further, the fact

---

[1] These provisions provide no limits on the scope of public property from which the City could "compel" the removal of weeds.  PV does not, however, raise any constitutional concerns with this broad power, and thus we do not consider the constitutional implications here.

that the General Assembly authorized civil penalties under Code § 15.2-901(C) in a similar context and not here suggests that the omission was intentional. *See Halifax Corp. v. First Union Nat'l Bank*, 262 Va. 91, 100 (2001) ("[W]hen the General Assembly includes specific language in one section of a statute, but omits that language from another section of the statute, we must presume that the exclusion of the language was intentional."). Thus, the City lacks authority to impose civil penalties for weeds violations on public property.[2]

In sum, we hold that the City may compel the removal of weeds and other nuisances on public and private property. If a property owner is afforded reasonable notice of such an obligation and fails to act, the City may abate the nuisance itself, charge abatement costs to the property owner as a lien, and enforce the lien by judicial sale. But the City may only issue civil penalties for violations on the owner's property. The circuit court thus erred in finding that the City exceeded its statutory authorization when it imposed costs and expenses for weed-cutting on public land.[3]

### III. Sufficiency of the Evidence of Violations

Having found that the City may enforce its weed abatement ordinance on public property in at least some instances, we turn to the question of whether the City presented sufficient evidence to

---

[2] Neither Code §§ 15.2-901 and 15.2-1115 nor the City Charter delineate the City's authority to charge administrative costs for each abatement. *See* Richmond City Code § 11-108(b) (authorizing a $150 administrative fee for each case of abatement). The City Charter allows the City to "abate or obviate the condition or nuisance" and "charge and collect the cost thereof from the owner," but does not specify what is included in those costs or charges. *See also* Code § 15.2-1115(A). Code § 15.2-901(A)(3) also allows "the cost and expenses" of cutting the weeds. As PV has not raised this issue, we decline to address whether these administrative charges are within the City's authority under Dillon's Rule.

[3] Because we ultimately conclude that the circuit court did not err in finding that the City failed to prove the violations in this case, we need not consider whether all "grass[es], plants, bushes, weeds or any other vegetation 12 inches high or over, other than trees, shrubbery, agricultural plants, garden vegetables, flowers or ornamental plants" qualify as "weeds" or a "nuisance" under Code § 15.2-1115(A). *See* Richmond City Code § 11-105(c).

prove the violations at issue. On appeal, we afford great deference to the factual findings of a trial court, "unless it appears from the evidence that" they are "plainly wrong or without evidence to support [them]." *City of Hopewell*, 239 Va. at 296 (quoting Code § 8.01-680). Put differently, we decline the City's invitation to "get into the weeds" here. The circuit court found that

> [r]egardless of [the Richmond City Code's] conformity to the Virginia Code and/or its applicability to the facts of this case, there has been insufficient evidence presented to allow the Court to find that a violation of [Richmond City Code §] 11-105 has occurred, both with regard to the height threshold therein, and as to whether or not the growth on [PV]'s property does not fall within one of the height exceptions set out in [Richmond City Code §] 11-105(c).

In making this sufficiency finding, the circuit court implicitly found that at least some portion of the parcel was owned by the City—otherwise the court would have applied Richmond City Code § 11-105(a), applicable to violations on private property. Instead, the final order specifies that the court applied Richmond City Code § 11-105(c), which covers only public land. Even still, the legal requirements of Richmond City Code § 11-105(c), dealing with City property, and 11-105(a), dealing with private property, are virtually identical. In either case, it is "unlawful for any person who owns or occupies property within the City to permit any grass, plant[s], bushes, weeds or any other vegetation 12 inches high or over, other than trees, shrubbery, agricultural plants, garden vegetables, flowers or ornamental plants," to grow in the designated areas. Richmond City Code § 11-105(a), (c). Thus, regardless of whether the circuit court believed the slope belonged to PV or to the City, and no matter which test the court applied, the court would have reached the same result—that the City failed to prove the violations occurred.

Based on the record before us, we cannot say that the circuit court's finding was "plainly wrong." *See City of Hopewell*, 239 Va. at 296. The City points to photographs dated May 30, 2018, and May 10, 2019, showing vegetation more than 12 inches high to the left of the stairs on the property, Beloff's admission that work on the yard was "a little bit backed up" and "needed

- 11 -

yard work," and the circuit court's statement that the photos were "horrendous" and "unacceptable." But there are major gaps in the City's evidence. Even the photos showing the yard in its most slipshod state, highlighted by the City, do not make clear whether the offending plants were "trees, shrubbery, agricultural plants, garden vegetables, flowers or ornamental plants" under the ordinance which could legally exceed 12 inches. *See* Richmond City Code § 11-105(a), (c). There is no documentary evidence of the 2013 violation that resulted in an assessment of $541. While later pictures include a ruler to show the height of the offending grass, the photos showing the 2015 violation include no such reference point, and it is in no way obvious that the grass was taller than 12 inches. The record includes no photographs of the two 2017 violations or the 2020 violation. In 2018, the City charged a $450 fee for tree removal that was never discussed at trial and for which there is no photo evidence. Pictures from March 8, 2021, show dying vegetation, but again the exact height of the grass is not discernable, and it is unclear whether other vegetation meets one of the ordinance's exceptions. Although a reasonable fact finder might have been able to find by a preponderance of the evidence that PV owes the City for the charges, we decline to disturb the reasonable conclusion of the circuit court here that the City failed to meet its burden.[4]

IV. Late Penalties, Interest, and Attorney Fees

The City also asserts that regardless of the circuit court's factual findings about the weeds penalties, the court erred in dismissing the City's action because PV had not paid all late tax penalties, interest, and reasonable attorney fees as required by Code § 58.1-3965(B). Under Code § 58.1-3965(A), "[w]hen any taxes on any real estate in a locality are delinquent on

---

[4] Because we affirm the findings of the circuit court that the City failed to meet its burden to prove the violations here, we need not consider the City's argument that PV owns the property beyond its surveyed boundary and to the center of Roanoke Street. Similarly, we need not decide whether the circuit court erred in finding that equitable estoppel prevented the City from enforcing its ordinance as to the slope.

December 31 following the second anniversary of the date on which such taxes have become due, . . . such real estate may be sold for the purpose of collecting all delinquent taxes on such property." The owner can cut off judicial sale proceedings by redeeming the property "before the date of the sale by paying all accumulated taxes, penalties, reasonable attorney fees, interest and costs thereon, including the pro rata cost of publication." Code § 58.1-3965(B). "Partial payment . . . shall not be sufficient." *Id.*

The City asserts that the record shows at least two times when PV paid its ordinary real estate taxes late, and thus incurred a penalty and interest. The circuit court "made no ruling on this issue and the [City] did not make this objection to the [circuit] court's [September 15, 2022] order." *Nelson v. Davis*, 262 Va. 230, 235 n.3 (2001). Though the final order notes that it was "seen and objected to" by the City, the City's failure to articulate a specific objection means that we may not address its argument here. *See* Rule 5A:18 ("No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated *with reasonable certainty* at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." (emphasis added)).[5] "The purpose of [Rule 5A:18] is to ensure that any perceived error by the trial court is 'promptly brought to the attention of the trial court with sufficient specificity that the alleged error can be dealt with and timely addressed and corrected when necessary." *Fox v. Fox*, 61 Va. App. 185, 201 (2012) (quoting *Brown v. Commonwealth*, 8 Va. App. 126, 131 (1989)). An appeal is not the correct forum for addressing the City's argument, which was not properly raised before the circuit court. *See id.* at 201-02 ("Errors can usually be corrected in

---

[5] The City did not invoke the good cause or ends of justice exception, and we decline to apply it here. *See Edwards v. Commonwealth*, 41 Va. App. 752, 761 (2003) (en banc).

the trial court, particularly in a bench trial, without the necessity of appeal." (quoting *Brown*, 8 Va. App. at 131)).[6]

CONCLUSION

Though we hold that the City is authorized under Code § 15.2-901 to require property owners to trim weeds on their own properties, and by the City Charter and Code § 15.2-1115 to compel removal of weeds on both private and public property, the circuit court was not plainly wrong in finding that the City failed to prove that PV had violated the City ordinance. The City failed to preserve its arguments about the remaining penalties and reasonable attorney fees and its right to cross-examine Beloff. We therefore affirm the judgment of the circuit court.

*Affirmed.*

---

[6] The City also asserts that the circuit court erred by denying the City the opportunity to cross-examine Beloff. Following Beloff's direct examination at the April 1, 2022 hearing, the circuit court noted its intention to order a survey of the property and request briefing on whether PV could be forced to pay for abatement on City property. The court then continued the hearing. Four days later, the City moved for an opportunity to cross-examine Beloff. In the next hearing, PV asserted that it had no further evidence other than the pending survey and requested more time to submit briefs on the results. The judge noted that "I think we need more argument on [the scope of the ordinance]. You probably don't need more evidence." The City did not object or further assert the need for cross-examination. Accordingly, we find that the City failed to preserve the issue for appellate review under Rule 5A:18.